IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 6, 2018

**KERVIN JACKSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-04457      J. Robert Carter, Jr., Judge**

_____

**No. W2017-01704-CCA-R3-PC**
_____

The petitioner, Kervin Jackson, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial. Following our review, we affirm the denial of the petition.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Claiborne Ferguson, Memphis, Tennessee, for the appellant, Kervin Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Goodman and Muriel Malone, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On January 13, 2013, the petitioner shot and killed his brother-in-law in the kitchen of their family home. Despite claiming self-defense at trial, a jury convicted the petitioner of first degree murder, and he received a life sentence. The petitioner subsequently challenged the sufficiency of the evidence supporting his conviction on direct appeal. This Court summarized the underlying facts leading to the petitioner's conviction as follows:

>       The victim, Taumarein Covington, was shot and killed on January 13, 2013, while standing in the kitchen of the home in which he lived with

his wife's family, including [the petitioner], his brother-in-law. [The petitioner] was arrested shortly after the shooting.

Pearlie Campbell, [the petitioner's] mother, owned the house where the incident took place. The modest home was occupied by multiple members of Ms. Campbell's family: Ms. Campbell; [the petitioner]; the victim; Dominique Covington, [the petitioner's] sister and the victim's wife; and [the petitioner's] sister Ashley Jackson and her child. Ms. Jackson and her child were not living at the residence permanently but were staying there on the day of the shooting.

Tancer Covington, the mother of the victim, testified that, about a week prior to his death, she met the victim at a bank to give him money for the first month's rent at a new apartment. During that meeting, the victim told her that he was "fearful of Dominique's brother."

The morning of the shooting, Ms. Campbell recalled sitting at the kitchen table "[w]aiting on Dominique and Ashley to get ready" to "go to the grocery store." The victim was in the kitchen sitting behind Ms. Campbell. According to Ms. Campbell:

> [The petitioner] came in[,] stood by the sink[,] and asked me where I was fixing to go[,] and I told him the grocery store[,] and he asked me who was going with me[,] and I told him[,] and then he said, "Well, it just ain't right, mama. It just ain't right." So you know he just kept talking so -- I mean when I bent to tie my shoe all I hear was pow, pow, and I just ran out the door.

Ms. Campbell did not actually see her son shoot the victim but "he was the only somebody in the room" other than her and the victim. She admitted that in her initial statement to police, she maintained that [the petitioner] was responsible for shooting the victim. In fact, she described the gun that [the petitioner] used to kill the victim as "black and may have had a little silver on it." She explained that [the petitioner] was employed as a security guard and routinely carried a gun.

The victim and his wife, Dominique, had been staying at the house for quite some time. They were saving money to move in to their own place. Ms. Campbell knew that the victim and Dominique were planning on moving out as soon as they were "stable." While they lived at the

house, Dominique and the victim slept on the floor in the living room on a blow up mattress. In order to make room for their bed, the couple had to rearrange some of the furniture in the living room. This often irritated [the petitioner], especially when the victim's gaming television was blocking the door.

On the morning of the incident the victim and [the petitioner] were "arguing." [The petitioner] was "telling him . . . he had to leave." Dominique stated that [the petitioner] never threatened to kill the victim but there was definitely tension between the two. She admitted that in her statement to police, she commented that [the petitioner] used the phrase "tick tock" when talking to the victim for several days prior to the incident. The victim reported to her that [the petitioner] was "taunting [the victim] and threatening to shoot him." Dominique later explained that [the petitioner] often used the phrase "tick tock" when "you need to do something." She did not perceive it as a threat toward her husband but thought that he was saying it because he wanted them to move out of the house. She described [the petitioner's] normal demeanor as "mad" and opined that the victim was "afraid" of [the petitioner] at the time of his death.

On the morning of the incident, Dominique and the victim got up around 11:00 or 12:00. After she arose that morning, Dominique was sitting in the living room listening to her iPod when she heard her mom say, "Kervin, no." After that, she heard one shot. Dominique "hit the floor and [she] heard [her] mom scream and run out the front door." Dominique ran to the front door to see where her mother was going but heard "the next couple of shots" and got back down onto the floor. After the shooting stopped, she ran in to the kitchen. She saw her brother standing there and her husband lying on the floor with blood around him. [The petitioner] "had a gun in his hand." Dominique saw [the petitioner] lay the gun down on the floor next to the victim's left hand. She picked the gun up and put it on the kitchen table.

Ashley Jackson was present at the home that morning but did not see anything happen. She heard the gunshots from her bedroom and dialed 911.

Officer Charles Taylor of the Memphis Police Department and his partner, Officer Jeremy Moore, responded to the shooting call the day of the incident. They received a report of a shooter, "male black, heavyset,

with black pants and a black like a hoody or a sweatshirt." On the way to the scene they found a male fitting the description "just standing in a driveway." He identified himself as [the petitioner]; his name matched that of the suspected shooter. During a pat down, officers located a .45 caliber handgun, three magazines loaded with eight rounds, eighteen loose rounds, and a towel in his right pocket. [The petitioner] stated that he was "justified" while receiving the pat down.

Officer Donald Cavatte responded to the scene with his partner, Officer Morris. When they arrived, the victim was on the floor in the kitchen with visible gunshot wounds to the head. There were shell casings on the floor. David Smith, the crime scene investigator, recovered a .40 caliber handgun from the kitchen table and logged four spent .45 caliber shell casings from the kitchen into evidence.

The .40 caliber handgun was purchased by [the petitioner] at Guns & Ammo in Memphis on December 31, 2011. At the time it was purchased, [the petitioner] had a concealed carry permit.

Sergeant Marcus Berryman of the homicide bureau interviewed [the petitioner] after his arrest. [The petitioner] waived his rights and gave a statement in which he admitted that he shot and killed the victim. [The petitioner] stated that he:

> Woke up th[at] morning[,] went outside to smoke a cigarette, came back from outside, used the rest room, went to the kitchen, some words were said between him. [The victim] said I'm going to kill you if you don't do this and I'm going to stick if you don't that. My thoughts to myself is [sic] that it would be self-defense. I was trying to protect my life and the lives around me. I sat back on the kitchen counter, waited about three minutes to see what he was going to say next.

[The petitioner] stated that he "shot him and that was it. He hit the stove and fell to the ground." [The petitioner] claimed that the victim was armed with a weapon in his left hand and was threatening [the petitioner] with the weapon. [The petitioner] said he "felt threatened" before he shot the victim. [The petitioner] thought that the victim was mad because he got "jumped" by several men.

- 4 -

The victim died from two gunshot wounds to the head and a graze wound to the side of the head along with a gunshot wound to the right forearm shot from an "indeterminate range."

[The petitioner] testified at trial. At the time of the incident, [the petitioner] was twenty-eight years old and weighed about 245 pounds. At the time of trial he weighed less. He worked as a security guard for AmeriGuard. [The petitioner] had worked as a security guard since he was eighteen years old. As part of his job, he had a concealed carry permit. [The petitioner] admitted that he had quit his job prior to the incident.

[The petitioner] owned two guns at the time of the crime -- a .40 caliber Smith & Wesson and a .45 caliber Ruger. [The petitioner] reported the Smith & Wesson missing in May. He claimed that he had no idea where the gun was located until he saw the victim with the gun that day.

On the morning of the incident, [the petitioner] got up, used the restroom, and encountered the victim, who told him he was "going to shoot [the petitioner] and a family of stickers." [The petitioner] told his mother about what the victim said to him. [The petitioner] testified:

> She said don't worry about it. She walked in the kitchen and sat down. I was walking behind her. I leaned on the counter. I walked behind [the victim] to the cupboard. I went to the T.V. area[,] leaned back on the kitchen counter. He said it again but she didn't hear it. By the time she got up, he had jumped up with his gun out so I fired.

[The petitioner] claimed that the victim was sitting with his arms crossed. He had his gun in his left hand. [The petitioner] could not see the barrel; the gun was pointed toward the window. The victim "showed me the gun about two minutes before my mother walks out. She jumps up and runs. He jumps up and I shot him. He pulled his gun so I shot." [The petitioner] felt "[t]hreatened [like his] life was in danger" and the lives of the "people in [his] household's [sic] in danger" because the victim had already "threatened us." [The petitioner] admitted that the victim did not get "off a shot" and that he shot the victim four or five times. After the shooting, [the petitioner] walked out of the room to put on his shoes. His sister Ashley and his mother told him to get out of the house. He walked "a block, . . . smoked a cigarette, used the restroom, and the police came." He was arrested and went straight to jail. He told the police that it was "self-

defense."  [The petitioner] maintained that he was "skeptical" of what the victim was going to do but that he "felt threatened."

On cross-examination, [the petitioner] claimed that he had no idea that the victim had the gun that [the petitioner] had previously reported missing.  He denied handling the gun after the victim was shot.  He saw the gun in the victim's left hand and claimed it remained in the victim's left hand after he was shot.  [The petitioner] admitted that no one else saw or heard the victim threaten him.

At the conclusion of the proof, the jury found [the petitioner] guilty of first degree murder and employing a firearm during the commission of a felony, as charged in the indictment.  The trial court dismissed the charge of employing a firearm during the commission of a felony because the charge only applied if the jury found [the petitioner] guilty of a lesser included offense.  The trial court sentenced [the petitioner] to life imprisonment.  Trial counsel filed a motion for new trial.  In the motion, counsel challenged the sufficiency of the evidence and the trial court's denial of the motion for judgment of acquittal.  The trial court denied the motion.  [The petitioner] filed a timely notice of appeal.

*State v. Kervin Jackson*, No. W2015-00134-CCA-R3-CD, 2016 WL 269324, at *1-4 (Tenn. Crim. App. Jan. 8, 2016) (footnotes omitted).  After its review, this Court upheld the rulings of the trial court, noting "[t]he jury obviously rejected [the petitioner's] claim of self-defense and accredited the State's version of the facts." *Id.* at *6.

The petitioner then filed a petition for post-conviction relief, alleging trial counsel was ineffective in that he "failed to present to the jury the inconsistent and inaccurate statements made by a key witness."  Specifically, the petitioner asserted Dominique Covington's trial testimony differed from the statement she gave police after the murder.  The petitioner explained:

The statement as presented at trial said that after the shooting she saw [the] [p]etitioner wipe a gun down and place it in [the victim's] hand.  However, her actual statement to the police and the DA was that the [p]etitioner's back was to her after the shooting and she could not see what he was doing.

- 6 -

As a result of the alleged inconsistencies of Ms. Covington, the petitioner further claims his conviction violated due process "because the State submitted known false testimony to the jury" in violation of *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Dominique Covington testified at the initial post-conviction evidentiary hearing. During her testimony, she explained that she gave a written statement to the police after the shooting on January 13, 2013, and that she later testified at the petitioner's trial. She acknowledged that at trial, the State specifically asked her if she saw "[the petitioner] wiping off the gun." Ms. Covington then reviewed her written statement, and it was entered into evidence. However, before testifying further about the alleged inconsistencies between her statement and trial testimony, the post-conviction court suspended the hearing to allow Ms. Covington to consult with an attorney.

At the subsequent post-conviction hearing, Ms. Covington explained her recollection of the events surrounding the shooting, her written statement to police after the shooting, and her trial testimony regarding the same. According to Ms. Covington, she entered the kitchen twice after the shooting. Upon her first entry, Ms. Covington "saw [her] husband laying on the floor" and the petitioner "standing in the doorway." She "saw the gun in [her] husband's hand" and she saw the petitioner "with his gun." Upon her second entry, the petitioner "still had his gun in his hand" while "the other gun . . . was still in [the victim's] hand." Ms. Covington stated the petitioner "was, like, I can't describe it but he was, like, over [the victim] with the gun. I'm not sure what was going on but [the petitioner] was over [the victim]. He might have been looking at the gun. I'm not sure. Everything just happened so fast."

Ms. Covington also discussed her trial testimony during which the State questioned her specifically about her statement to police. In the January 13, 2013 statement, Ms. Covington told police she saw the petitioner "wiping off the silver and black gun with a hand towel and then [the petitioner] put it in [the victim's] left hand." At trial, Ms. Covington stated she "might have" told police she saw the petitioner "wiping off the . . . gun" with a hand towel. At the post-conviction hearing, Ms. Covington ultimately stated, "I did not see [the petitioner] wipe [the gun] down and I'm not certain what I said to [the police]." In addressing the discrepancies between her written statement, trial testimony, and post-conviction hearing testimony, Ms. Covington admitted to signing the statement, but clarified that she did not "remember half of what [she] said." Ms. Covington stated she may have made the statement, but "[t]o be honest, I said a lot of things to them that half are not even in the statement."

Furthermore, Ms. Covington explained that prior to trial, she told trial counsel that portions of her statement were incorrect. Trial counsel told Ms. Covington to contact the

district attorney's office, and Ms. Covington believed her written statement would be corrected prior to the petitioner's trial.

During cross-examination, the State reviewed portions of Ms. Covington's trial testimony and compared it to her direct testimony during the post-conviction hearing. Specifically, at trial, Ms. Covington testified she saw "only one" gun in the kitchen after the shooting, but at the post-conviction hearing, she stated she saw two. Regarding the "wiping off the . . . gun" statement made to police, Ms. Covington testified, "I'm not sure if that's what I said. That may be what I said, yes, sir." Additionally, Ms. Covington admitted she did not tell the officers she spoke to on January 13, 2013 that portions of her written statement were inaccurate "because [she] d[idn't] even remember who [she] spoke to that night."

Trial counsel then testified. One of the biggest challenges he faced in the petitioner's case was the fact that all of the witnesses to the shooting were the petitioner's family members. Trial counsel stated "what they would say in my office didn't always line up with the statements they made to the police earlier and that was always going to be the biggest problem." Another issue in the petitioner's case was whether he placed a gun in the victim's hand after the shooting. Trial counsel explained:

> The gun -- that particular gun belonged to [the petitioner] and he'd reported it stolen sometime before the shooting actually happened. And our theory at trial was that this was self-defense, that [the victim] had the gun out at the breakfast table and was making threatening gestures towards . . . [the petitioner], rather. And so whether or not, you know, who had the gun in their hand at that point was pretty important. If [the petitioner] is placing the gun in [the victim's] hand after the shooting, it seems less likely that [the victim] actually had the gun at the time and that [the petitioner], rather, had planted it on him after the fact to make it fit the self-defense story kind of.
>
> . . .
>
> Most of the other facts didn't really change much so whether or not [the petitioner] placed that evidence would be -- that would really be showing a sign of guilt if [the jury] believed that.

Trial counsel remembered discussing the "wiping off the . . . gun" statement with Ms. Covington in his office. Ms. Covington told trial counsel "either she didn't remember that happening or didn't remember telling the police that, something to the effect that that wasn't what she remembered seeing." Trial counsel advised Ms.

Covington, and all of the petitioner's family members, to contact the district attorney's office regarding any inaccuracies in their statements made to officers after the shooting. Trial counsel admitted, "if she hadn't seen [the petitioner] wiping [the gun] down and placing it in [the victim's] hand, that would be beneficial to [the petitioner's] case."

Trial counsel then addressed his strategy regarding Ms. Covington's trial testimony as it related to her January 13, 2013 statement. Trial counsel explained he did not attempt to suppress portions of Ms. Covington's written statement because "there didn't appear to be anything wrong with the statement itself, just maybe her recollection." Trial counsel described his strategy, as follows:

> I tried to kind of -- it had been brought up a little bit about where the gun was and who had placed it and I did not want to call more attention to it than I needed to so I think my recollection is I tried to kind of avoid questioning more about that so the jury didn't spend more time thinking about it.

Trial counsel admitted Ms. Covington's testimony regarding whether she saw the petitioner "wiping off the . . . gun" was important to the petitioner's case. Finally, trial counsel stated he did not ask for a *limine* instruction on impeachment evidence because the trial court provided a "proper jury instruction" of the same.

After its review of the evidence presented, the post-conviction court found "[trial] [c]ounsel's trial strategy was to emphasize their theory of self-defense and to not place undue influence on Dominique Covington's testimony." The post-conviction court held trial counsel pursued "a sound strategy," and denied relief. This timely appeal followed.

## ANALYSIS

On appeal, the petitioner asserts the outcome of his trial would have been different absent the deficiencies of trial counsel. The petitioner argues trial counsel "failed to elicit crucial testimony that could have substantiated a viable claim of self-defense." The State contends "the petitioner has failed to present any evidence which would overcome the presumption that [trial counsel's] decision was sound trial strategy." Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn.

- 9 -

1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *See id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must

overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Here, the petitioner alleges trial counsel was ineffective in his handling of Ms. Covington's testimony at trial. The petitioner asserts trial counsel failed to properly highlight the fact that Ms. Covington "recanted [the] critical statement" wherein she told police she saw the petitioner "wiping off the . . . gun" in the kitchen after the shooting. In contrast, the State asserts "[t]he testimony the petitioner references did not exist until his post-conviction hearing, and therefore there was no deficient performance by trial counsel for failing to bring it out." Further, the State contends "the petitioner has failed to show how [trial counsel's] decisions were something other than a sound trial strategy." Upon our review, we agree with the State.

The post-conviction court provided the following context for the petitioner's trial and present claim, stating: "In this case, trial counsel was faced with the dilemma of witnesses, who did not want to testify against their family member, but who had given accounts of the shooting immediately following the event." As noted by the State, Ms. Covington did not unequivocally deny her statement about seeing the petitioner "wiping off the . . . gun" until the post-conviction hearing. As such, the evidence produced at the post-conviction hearing details trial counsel's strategy regarding Ms. Covington's fluctuating testimony between her written statement to police and her testimony at trial. Regarding trial counsel's strategy, the post-conviction court explained:

> In this case, [the] [p]etitioner present[ed] the testimony of, his sister, Dominique Covington. This witness gave a specific, detailed version of the events on the day of the homicide. By the time of the trial, it appear[ed] that she had some reluctance in testifying against her brother, but still basically confirmed her earlier version.
>
> . . .
>
> As the case was preparing to be tried, [trial] counsel['s] [] strategy was to raise self-defense. In fact, [the] [p]etitioner testified on his own behalf. When faced with witness statements that were more incriminatory than the actual testimony, counsel chose to try to minimize or obsure (sic) the impact of that impeaching evidence.
>
> It is clear that the witness['], [Ms.] Covington, recollection has become more favorable to [the] [p]etitioner as time has passed.

Our review of the record mirrors that of the post-conviction court. The record indicates that at the time of trial, trial counsel believed that Ms. Covington either did not remember the petitioner "wiping off the . . . gun" or "[she] didn't remember telling the police that." Trial counsel testified "there didn't appear to be anything wrong with the statement itself, just maybe [Ms. Covington's] recollection" of the same. As a result, trial counsel chose to minimize Ms. Covington's trial testimony in order to not draw more attention to her apparent failed memory and the possibility that the petitioner did not act in self-defense. The post-conviction court held "[trial] [c]ounsel had a sound strategy for coping with the testimony of Dominique Covington," and we agree. Nothing in the record demonstrates trial counsel's strategy regarding Ms. Covington's testimony was not sound. *Strickland*, 466 U.S. at 689. Furthermore, the post-conviction court stated, "[t]he fact that [Ms. Covington] now wants to seemingly recant portions of her [trial] testimony does not create proof that trial counsel's performance was deficient." Again, we agree. The petitioner has failed to show that trial counsel's strategy regarding Ms. Covington's trial testimony amounted to deficient performance. *See* Tenn. Code Ann. § 40-30-110(f); *Goad*, 938 S.W.2d at 369. The petitioner is not entitled to relief.

In denying post-conviction relief, the post-conviction court stated, "[i]n light of all of the proof in the case, it cannot be said that [trial] counsel was defective in the handling of [Ms. Covington] or of the case in general." We agree with the trial court's assessment of the petitioner's claims. No evidence exists in the record to support his attack on trial counsel's performance or how the alleged deficient performance affected the outcome of his trial. *See Strickland*, 466 U.S. at 687. The petitioner is not entitled to post-conviction relief for his claim of ineffective assistance of counsel.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE

- 12 -